UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

[1] VENVER S.A., and
[2] AMERICAS COIL TUBING LLC

Plaintiffs,

vs.

[1] GEFCO, INC.,

Defendant

CIVIL ACTION NO. CIV-18-790-SLP

Jury Trial Demanded

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Venver S.A. ("Venver") and Americas Coil Tubing LLC ("ACT") contracted to purchase a drilling rig from Defendant Gefco, Inc ("Gefco"). Plaintiffs paid for the drilling rig, but Gefco never delivered a rig that complied with the contract specifications, and repeatedly failed to correct that failing.

Plaintiffs allege as follows:

## PARTIES

1.     Plaintiff Venver S.A. is a corporation ("Sociedad Anónima") formed in the Argentine Republic. Its principal place of business is in the Argentine Republic.

2.     Plaintiff Americas Coil Tubing LLC is a limited liability company formed in Texas. Its principal place of business is in Harris County, Texas. Its sole member is an individual who is domiciled in Harris County, Texas.

3.     Defendant Gefco, Inc. is a corporation formed in Tennessee. Its principal place of business is in Garfield County, Oklahoma. It may be served with process

through its registered agent, National Registered Agents Inc., 1833 South Morgan Road, Oklahoma City, OK 73128.

## JURISDICTION AND VENUE

4.     The amount in controversy in this matter exceeds $75,000.  This court has diversity jurisdiction pursuant to U.S. Const. art. 3, § 2, and 28 U.S.C. § 1332(a)(3), (4).

5.     Venue is proper in the Western District of Oklahoma pursuant to 28 U.S.C. § 1391, as Defendant Gefco resides in this district and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

6.     Gefco is a manufacturer and seller of portable drilling rigs for the oil & gas exploration business.

7.     Venver operates oil & gas drilling rigs in Argentina.

**I.     Gefco contracted to sell a drilling rig to ACT and Venver.**

8.     Through a written agreement dated August 1, 2013, Gefco agreed to sell to ACT a "VR-500" top head drive drilling rig and related equipment, for $8,451,509.00.

9.     ACT purchased the rig for the express benefit of Venver.  Venver is therefore entitled to enforce the contract. OKLA. STAT. ANN. tit. 15 § 29.

10.     Gefco knew at the time of the agreement that ACT was purchasing the rig for the benefit of Venver.  Gefco acknowledged Venver's beneficiary status in the Warranty section of the agreement, which extended the "first purchaser" warranty to Venver.

11.     The VR-500 purchase contract included detailed specifications for the rig. In particular, a material and negotiated specification required the rig's top head drive to be able to deliver 11,500 ft-lbs of torque at 160 RPM.

12.     Gefco also represented that the rig would be certified by the American Petroleum Institute ("API").

13.     Gefco agreed to deliver the rig "approximately" 120 days after receipt of the firm order and receipt of a 30% down payment, "subject to conditions beyond our control and availability of truck."

14.     ACT and Venver delivered a down payment to Gefco, in excess of 30% of the purchase price, by September 12, 2013.  Accordingly, the agreed delivery date was approximately January 12, 2014.

**II.     Venver obtained a five-year driling contract for the rig.**

15.     While awaiting delivery of the VR-500 drilling rig, Venver entered a contract to supply drilling equipment and services to YPF S.A., a major Argentine integrated oil and gas company.  The YPF contract was for at least 60 months of service.

16.     The terms of the YPF contract allowed for Venver to make a substantial profit if it was able to perform. Venver needed the VR-500 drilling rig in order to perform the contract with YPF, and entered the contract with YPF in reliance on Gefco's promise to deliver the VR-500 drilling rig according to the contracted specifications.

**III.     Gefco delivered a defective drilling rig.**

17.     Gefco did not deliver a drilling rig to Venver/ACT until July 2014, over six months after its promised delivery date.

18.    That delay was not reasonable.

19.    Gefco's delayed delivery was not caused by conditions beyond Gefco's control.

20.    Gefco's delayed delivery was not caused by a lack of truck availability.

21.    Venver and ACT nonetheless took delivery of the rig, and paid the balance owed on the rig's purchase price.

22.    The rig's mast was not API certified, as Gefco had promised.  Gefco did not disclose this fact to Venver or ACT.  Neither Venver nor ACT knew, when they took delivery of the rig, that the rig was not API certified.

23.    From Gefco's facility in Tennessee the VR-500 rig was shipped, partially unassembled, to its ultimate destination in Argentina.

24.    The VR-500 rig arrived at the site of its first well to drill in March 2015. At that point Venver first learned that the rig's mast had no API certification.  The lack of certification delayed drilling by 30 days, as YPF would not allow the rig to commence work without an acceptable certification.

25.    When the VR-500 rig started working in April 2015, it began suffering repeated catastrophic failures.

26.    Less than three weeks after the rig began working, both of its hydraulic power unit motors burned out.  This failure was caused by defective O-ring assemblies.

27.    The VR-500 rig re-commenced working with rented motors.  The rig then lasted only a few hours before the top head drive's pinion and carriage bearings failed on or about May 1, 2015.

28.     The failure of the VR-500 rig's top head drive's pinion and carriage bearings was caused by a lack of factory lubrication and the defective factory assembly of the automatic lubrication system.

29.     The failure of the rig's top head drive's pinion and carriage bearings prevented the rig from working for nearly three weeks.

30.     The VR-500 rig next re-commenced working on or about May 20, 2015. The rig lasted just seven more weeks before the top head drive's planetary gearbox and hydraulic motor failed on or about July 8, 2015.

31.     The failure of the top head drive's planetary gearbox and hydraulic motor was caused by defects in the design of the rig.

**IV.     YPF cancelled the drilling contract.**

32.     These repeated failures of the rig led YPF to suspend its contract with Venver.  When Gefco proved unable to timely repair the rig and provide design changes necessary to prevent further failures, YPF terminated the contract.

**V.     Venver discovered the rig's failure to conform to the contract.**

33.     After the third catastrophic failure of the VR-500 rig, Venver built a test bench with a dynamometer to evaluate whether the rig could perform as expected after repairs, without design modifications.

34.     Through these tests, Venver first learned that the rig's maximum torque at 160 RPM was far less than the contract specification of 11,500 ft-lbs.

35.     The VR-500 rig delivered to Venver has never been able to provide 11,500 ft-lbs of torque at 160 RPM (350 hp).

36.     The VR-500 rig delivered to Venver has never been able to provide 350 hp at any speed.

37.     The VR-500 rig delivered to Venver had never been able to provide 11,500 ft-lbs of torque at 160 RPM (350 hp) safely, under normal working conditions, for any reasonable length of time.

38.     The maximum rotary power of the VR-500 rig delivered to Venver was materially less than 11,500 ft-lbs of torque at 160 RPM (350 hp).

39.     During tests, the maximum power that the VR-500 rig achieved was only 226 horsepower, equivalent to approximately 7418 ft-lbs at 160 RPM.

40.     The design of the VR-500 rig delivered to Venver did not allow it to provide 11,500 ft-lbs of torque at 160 RPM (350 hp).

41.     The design of the VR-500 rig delivered to Venver did not allow it to provide 11,500 ft-lbs of torque at 160 RPM (350 hp) safely, under normal working conditions, for any reasonable length of time.

42.     The VR-500 rig delivered to Venver was designed to provide materially less than 11,500 ft-lbs of torque at 160 RPM (350 hp).

43.     The VR-500 rig delivered to Venver could not rotate faster than 135 RPM without failing.

44.     The VR-500 rig delivered to Venver was not designed to rotate faster than 135 RPM without failing.

**VI.   Gefco attempted "Option C" to correct the defects in the rig delivered to Venver.**

45.   Venver timely notified Gefco of the rig's defects.

46.   Gefco offered Venver three options for correcting the rig's defects. Gefco described those options as options "A," "B," and "C." Only "Option C" offered to meet the contract specifications. Venver asked Gefco to try "Option C."

47.   Gefco finally implemented these modifications in August and September of 2017.

**VII.   Gefco's "Option C" modifications failed.**

48.   The "Option C" modifications to the VR-500 rig failed to bring it into compliance with the parties' contract.

49.   The VR-500 rig remained, after the "Option C" modifications, unable to provide 11,500 ft-lbs of torque at 160 RPM (350 hp).

50.   The VR-500 rig remained, after the "Option C" modifications, unable to materially comply with the specifications of the parties' August 1, 2013 purchase agreement.

51.   Gefco has admitted that it has yet to prove that the VR-500 rig complies with the specifications of the parties' contract.

**VIII.   Gefco offered no effective resolution, and now refuses further communication.**

52.   In September 2017 Gefco offered yet another design change that purportedly would bring the VR-500 rig into compliance with the contract specifications.

53.     Venver then consulted with the manufacturer of Gefco's hydraulic power unit motors, SAi Hydaulics, Inc. ("SAi"), for confirmation that Gefco's plan was feasible.

54.     SAi reported that the conditions suggested by Gefco were not suitable for the motors, and under those conditions the motors would last just "hours" before failure, even under intermittent running conditions.

55.     Venver shared this information with Gefco by January 2018.

56.     Gefco responded in April 2018.  Its response did not did not address SAi's report that Gefco's design was not suitable for the motors, or SAi's conclusion that under the stated conditions the motors would last just "hours" before failure.

57.     On May 16, 2018, Venver asked Gefco (by email) for confirmation of the hydraulic circuit parameters by which Gefco proposed to achieve 160 RPM at 11,500 ft-lbs (350 hp) on the Top Drive System of the VR-500 rig.

58.     Gefco did not respond to Venver's email of May 16, 2018.

59.     On May 28, 2018, Venver advised Gefco (by email): "We still haven't received an answer to our email sent 16th May in order to clarify the hydraulic system parameters that you are proposing (see attached).  Do you have any difficulty in replying to our email?"

60.     Gefco has not responded to Venver's email of May 28, 2018.

61.     On June 28, 2018, Venver called SAi again.  In that telephone conversation, SAi asked Venver to stop calling about Gefco's proposal.  SAi stated that Gefco had instructed SAi to not speak with Venver about Gefco's proposal.

## **FIRST CAUSE OF ACTION—BREACH OF CONTRACT**

62.     Gefco contracted to sell a drilling rig and related equipment and services to ACT for the benefit of Venver.  Gefco failed to deliver a drilling rig that conformed to the contract.

63.     Venver and ACT have rejected the whole of the goods and services tendered by Gefco, as permitted by OKLA. STAT. ANN. tit. 12A § 2-601.

64.     Alternatively, to the extent that either Venver or ACT is deemed to have previously accepted the rig sold by Gefco, Venver and ACT have revoked that acceptance, as permitted by OKLA. STAT. ANN. tit. 12A § 2-608.  Any such acceptance would have been made without discovery of the rig's failure to conform to the contract and would have been reasonably induced by the difficulty of discovery.  Alternatively, to the extent that either Venver or ACT is deemed to have accepted the rig with knowledge of its nonconformity, any such acceptance would have been made on the reasonable assumption that the nonconformity would be seasonably cured, and it has not been seasonably cured.  The rig's failure to conform to the contract substantially impairs its value to Venver and ACT.

65.     Venver and ACT have cancelled the contract, as permitted by OKLA. STAT. ANN. tit. 12A § 2-711, and have asked Gefco to return the purchase price.

66.     Gefco's failure to deliver a conforming rig has caused Venver to suffer damages in addition to the purchase price.

67. Any contractual limitations on Venver's recovery are void because the limited-recovery provisions failed of their essential purpose of providing Venver with a working drilling rig that conformed to the contract.

## SECOND CAUSE OF ACTION—BREACH OF WARRANTY

68. Gefco expressly warranted that the VR-500 rig would conform to the specifications of the parties' contract, and that the rig would be free from defects in material and workmanship. Gefco expressly agreed to cure any such defects by replacement or repair.

69. The rig that Gefco delivered to Venver did not conform to the specifications of the parties' contract, and was defective in design and construction. Gefco has failed to cure the defects of the rig, despite reasonable opportunity. Therefore, any limitations on the scope of Gefco's warranties, or on the remedies available to Venver and ACT, have failed of their essential purpose, and are void.

70. The rig also failed to comply with the implied warranty that it would be merchantable. The rig would not pass without objections in the trade under the contract description, and was never fit for the ordinary purposes for which such a rig is used in the market in which Gefco knew the rig was intended to be used.

71. The rig also failed to comply with the implied warranty of fitness for a particular purpose. Gefco had reason to know at the time of contracting with ACT and Venver of the particular purpose for which the rig was required, and ACT and Venver relied on Gefco's skill and judgment to furnish a suitable rig. Yet Gefco failed to deliver a suitable rig.

72.     To the extent that the parties' contract disclaims any implied warranties, the disclaimer is ineffective because it is tainted with and by Gefco's misrepresentations concerning the condition, quality, characteristics and fitness of the rig, as detailed further below.  ACT and Venver relied on those misrepresentations to their detriment.

73.     Gefco's failure to comply with its warranties has caused Venver to suffer damages.

### THIRD CAUSE OF ACTION—FRAUD, DECEIPT

74.     Gefco represented to Venver and ACT that it could and would make and deliver a drilling rig able to provide 11,500 ft-lbs of torque at 160 RPM (350 hp) safely, under normal working conditions. This representation was untrue. When Gefco made the representation, it either knew it was false or made it recklessly without knowledge of its truth and as a positive assertion. Alternatively, Gefco made the representation as a positive assertion while having no reasonable ground for believing it to be true, OKLA. STAT. ANN. tit. 76 § 3, and/or in a manner not warranted by the information known to Gefco. OKLA. STAT. ANN. tit. 15 § 58.

75.     Gefco made the representation with the intention that ACT and Venver act on it by agreeing to purchase the promised rig, and by paying for it. ACT and Venver did act on the representation by, among other things, agreeing to purchase the promised rig and paying for it. Venver has suffered injury because of that reliance. 76 OKLA. STAT. ANN. tit. 76 § 2.

## ATTORNEY'S FEES

76.    Plaintiffs ask for a reasonable attorney fee for the prosecution of this action. Such a fee award is allowed by, for example, OKLA. STAT. ANN. tit. 12 §§936(A) and 939.

## CONDITIONS PRECEDENT

77.    All conditions precedent to these claims have occurred or have been performed.

## JURY DEMAND

78.    Plaintiffs requests trial by jury.

## PRAYER

79.    WHEREFORE, Plaintiffs Venver S.A. and Americas Coil Tubing LLC ask the Court to award them:

    a.   The return of all monies paid to Gefco in connection with the purchase of the VR-500 rig and related equipment and services;

    b.   Actual damages, including without limitation:

        i.    market price differentials and "cover" allowed by the UCC;

        ii.   expenses incurred in the transportation, inspection, care and custody of the rig and related equipment;

        iii.  expenses incurred in attempting to cure the rigs' defects;

        iv.   charges, expenses and commissions which may be incurred in effecting cover;

        v.    the cost of labor and other operating expenses incurred in attempting to operate the rig; and

      vi.    lost profits, including the lost profits expected from Venver's contract with YPF;

c.   exemplary damages;

d.   pre- and post-judgment interest;

e.   attorney's fees and expenses;

f.   cost of court; and

g.   such further relief, at law or in equity, to which Plaintiffs may be justly entitled.

Respectfully submitted,

*/s/ W. Casey Gray*

Bradley A. Gungoll OBA #3660
W. Casey Gray OBA #31379
Gungoll, Jackson, Box & Devoll, P.C.
101 Park Avenue, Suite 1400
Oklahoma City, OK 73102
(405) 272-4710 (Phone)
(405) 272-5141 (Facsimile)
gungoll@gungolljackson.com
gray@gungolljackson.com

**LOCAL COUNSEL FOR PLAINTIFFS**

**ATTORNEY-IN-CHARGE FOR PLAINTIFFS:**

*/s/ Reagan D. Pratt*

**Reagan D. Pratt**
Texas State Bar #00788218 (admitted to this Court)
Pratt & Flack LLP
4306 Yoakum Blvd., Suite 500
Houston, Texas 77006
Telephone:  713-936-2402
Facsimile:  713-481-0231
Email:  rpratt@prattflack.com

**OF COUNSEL FOR PLAINTIFF:**

**Paul D. Flack**
Texas State Bar #00786930
Pratt & Flack LLP
4306 Yoakum Blvd., Suite 500
Houston, Texas 77006
Telephone:  713-705-3087
Email:  pflack@prattflack.com

*Pro hac vice admission to be requested*