UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| [1] VENVER S.A., and<br>[2] AMERICAS COIL TUBING LLC<br><br>    Plaintiffs,<br><br>vs.<br><br>[1] GEFCO, INC.,<br>    Defendant | CIVIL ACTION NO. CIV-18-790-SLP<br><br><br><br>Jury Trial Demanded |

**PLAINTIFFS' SECOND AMENDED COMPLAINT**

Plaintiffs Venver S.A. ("Venver") and Americas Coil Tubing LLC ("ACT") contracted to purchase a drilling rig from Defendant Gefco, Inc ("Gefco"). Plaintiffs paid for the drilling rig, but Gefco never delivered a rig that complied with the contract specifications, and repeatedly failed to correct that failing.

Plaintiffs allege as follows:

**PARTIES**

1. Plaintiff Venver S.A. is a corporation ("Sociedad Anónima") formed in the Argentine Republic. Its principal place of business is in the Argentine Republic.

2. Plaintiff Americas Coil Tubing LLC is a limited liability company formed in Texas. Its principal place of business is in Harris County, Texas. Its two members are both domiciled in Harris County, Texas.

3. Defendant Gefco, Inc. is a corporation formed in Tennessee. Its principal place of business is in Garfield County, Oklahoma. It may be served with process

through its registered agent, National Registered Agents Inc., 1833 South Morgan Road, Oklahoma City, OK 73128.

## JURISDICTION AND VENUE

4. The amount in controversy in this matter exceeds $75,000.  This court has diversity jurisdiction pursuant to U.S. Const. art. 3, § 2, and 28 U.S.C. § 1332(a)(3), (4).

5. Venue is proper in the Western District of Oklahoma pursuant to 28 U.S.C. § 1391, as Defendant Gefco resides in this district and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

6. Gefco is a manufacturer and seller of portable drilling rigs for the oil & gas exploration business.

7. Venver operates oil & gas drilling rigs in Argentina.

**I.   Gefco contracted to sell a drilling rig to ACT and Venver.**

8. Through a written agreement dated August 1, 2013, Gefco agreed to sell to ACT a "VR-500" top head drive drilling rig and related equipment, for $8,451,509.00.

9. ACT purchased the rig as agent on behalf of, and for the express benefit of, Venver.  Venver is therefore entitled to enforce the contract as a third-party beneficiary, OKLA. STAT. ANN. tit. 15 § 29, and under the common law rule that a principal may maintain an action on a written contract made by an agent in his own name.

10. Gefco knew at the time of the agreement that ACT was purchasing the rig on behalf of and for the benefit of Venver.  Gefco acknowledged Venver's beneficiary

status in the Warranty section of the agreement, which extended the "first purchaser" warranty to Venver.

11. The VR-500 purchase contract included detailed specifications for the rig. In particular, a material and negotiated specification required the rig's top head drive to be able to deliver 11,500 ft-lbs of torque at 160 RPM.

12. Gefco also represented to Venver, prior to August 1, 2013, that the rig would be certified by the American Petroleum Institute ("API"). That affirmation of fact became a part of the basis of the parties' bargain and created an express warranty that the rig would be API certified. *See* OKLA. STAT. ANN. tit. 12A §§ 2-202, 2-313.

13. Gefco agreed to deliver the rig "approximately" 120 days after receipt of the firm order and receipt of a 30% down payment, "subject to conditions beyond our control and availability of truck."

14. ACT and Venver delivered a down payment to Gefco, in excess of 30% of the purchase price, by September 12, 2013. Accordingly, the agreed delivery date was approximately January 12, 2014.

**II.    Venver obtained a five-year drilling contract for the rig.**

15. While awaiting delivery of the VR-500 drilling rig, Venver entered a contract to supply drilling equipment and services to YPF S.A., a major Argentine integrated oil and gas company. The YPF contract was for at least 60 months of service.

16. The terms of the YPF contract allowed for Venver to make a substantial profit if it was able to perform. Venver needed the VR-500 drilling rig in order to

perform the contract with YPF, and entered the contract with YPF in reliance on Gefco's promise to deliver the VR-500 drilling rig according to the contracted specifications.

### III. Gefco delivered a defective drilling rig.

17. Gefco did not deliver a drilling rig to Venver/ACT until July 2014, over six months after its promised delivery date.

18. That delay was not reasonable.

19. Gefco's delayed delivery was not caused by conditions beyond Gefco's control.

20. Gefco's delayed delivery was not caused by a lack of truck availability.

21. Venver and ACT nonetheless took delivery of the rig, and paid the balance owed on the rig's purchase price.

22. The VR-500 rig was not API certified. Gefco did not disclose this fact to Venver or ACT. Neither Venver nor ACT knew, when they took delivery of the rig, that the rig was not API certified.

23. From Gefco's facility in Tennessee the VR-500 rig was shipped, partially unassembled, to its ultimate destination in Argentina.

24. The VR-500 rig arrived at the site of its first well to drill in March 2015. At that point Venver first learned that the rig's mast had no API certification. The lack of certification delayed drilling by 30 days, as YPF would not allow the rig to commence work without an acceptable certification.

25. When the VR-500 rig started working in April 2015, it began suffering repeated catastrophic failures.

26.  Less than three weeks after the rig began working, both of its hydraulic power unit motors burned out.  This failure was caused by defective O-ring assemblies.

27.  The VR-500 rig re-commenced working with rented motors.  The rig then lasted only a few hours before the top head drive's pinion and carriage bearings failed on or about May 1, 2015.

28.  The failure of the VR-500 rig's top head drive's pinion and carriage bearings was caused by a lack of factory lubrication and the defective factory assembly of the automatic lubrication system.

29.  The failure of the rig's top head drive's pinion and carriage bearings prevented the rig from working for nearly three weeks.

30.  The VR-500 rig next re-commenced working on or about May 20, 2015. The rig lasted just seven more weeks before the top head drive's planetary gearbox and hydraulic motor failed on or about July 8, 2015.

31.  The failure of the top head drive's planetary gearbox and hydraulic motor was caused by defects in the design of the rig.

**IV.   YPF cancelled the drilling contract.**

32.  These repeated failures of the rig led YPF to suspend its contract with Venver.  When Gefco proved unable to timely repair the rig and provide design changes necessary to prevent further failures, YPF terminated the contract.

## V. Venver discovered the rig's failure to conform to the contract.

33. After the third catastrophic failure of the VR-500 rig, Venver built a test bench with a dynamometer to evaluate whether the rig could perform as expected after repairs, without design modifications.

34. Through these tests, Venver first learned that the rig's maximum torque at 160 RPM was far less than the contract specification of 11,500 ft-lbs.

35. As delivered to Venver, the VR-500 rig was not able to provide 11,500 ft-lbs of torque at 160 RPM (350 hp).

36. The VR-500 rig delivered to Venver has never been able to provide 11,500 ft-lbs of torque at 160 RPM (350 hp).

37. The VR-500 rig delivered to Venver has never been able to provide 350 hp at any speed.

38. The VR-500 rig delivered to Venver had never been able to provide 11,500 ft-lbs of torque at 160 RPM (350 hp) safely, under normal working conditions, for any reasonable length of time.

39. The maximum rotary power of the VR-500 rig delivered to Venver was materially less than 11,500 ft-lbs of torque at 160 RPM (350 hp).

40. During tests, the maximum power that the VR-500 rig achieved was only 226 horsepower, equivalent to approximately 7418 ft-lbs at 160 RPM.

41. The design of the VR-500 rig delivered to Venver did not allow it to provide 11,500 ft-lbs of torque at 160 RPM (350 hp).

42. The design of the VR-500 rig delivered to Venver did not allow it to provide 11,500 ft-lbs of torque at 160 RPM (350 hp) safely, under normal working conditions, for any reasonable length of time.

43. The VR-500 rig delivered to Venver was designed to provide materially less than 11,500 ft-lbs of torque at 160 RPM (350 hp).

44. The VR-500 rig delivered to Venver could not rotate faster than 135 RPM without failing.

45. The VR-500 rig delivered to Venver was not designed to rotate faster than 135 RPM without failing.

**VI.  Gefco attempted "Option C" to correct the defects in the rig delivered to Venver.**

46. Venver timely notified Gefco of the rig's defects.

47. Gefco offered Venver three options for correcting the rig's defects. Gefco described those options as options "A," "B," and "C." Only "Option C" offered to meet the contract specifications. Venver asked Gefco to try "Option C."

48. Gefco finally implemented these modifications in August and September of 2017.

**VII.  Gefco's "Option C" modifications failed.**

49. The "Option C" modifications to the VR-500 rig failed to bring it into compliance with the parties' contract.

50. The VR-500 rig remained, after the "Option C" modifications, unable to provide 11,500 ft-lbs of torque at 160 RPM (350 hp).

51. The VR-500 rig remained, after the "Option C" modifications, unable to materially comply with the specifications of the parties' August 1, 2013 purchase agreement.

52. Gefco has admitted that it has yet to prove that the VR-500 rig complies with the specifications of the parties' contract.

**VIII. Gefco offered no effective resolution, and now refuses further communication.**

53. In September 2017 Gefco offered yet another design change that purportedly would bring the VR-500 rig into compliance with the contract specifications.

54. Venver then consulted with the manufacturer of Gefco's top drive motors, SAi Hydraulics, Inc. ("SAi"), for confirmation that Gefco's plan was feasible.

55. SAi reported that the conditions suggested by Gefco were not suitable for the motors, and under those conditions the motors would last just "hours" before failure, even under intermittent running conditions.

56. Venver shared this information with Gefco by January 2018.

57. Gefco responded in April 2018. Its response did not address SAi's report that Gefco's design was not suitable for the motors, or SAi's conclusion that under the stated conditions the motors would last just "hours" before failure.

58. On May 16, 2018, Venver asked Gefco (by email) for confirmation of the hydraulic circuit parameters by which Gefco proposed to achieve 160 RPM at 11,500 ft-lbs (350 hp) on the Top Drive System of the VR-500 rig.

59. Gefco did not respond to Venver's email of May 16, 2018.

60. On May 28, 2018, Venver advised Gefco (by email): "We still haven´t received an answer to our email sent 16th May in order to clarify the hydraulic system parameters that you are proposing (see attached). Do you have any difficulty in replying to our email?"

61. Gefco has not responded to Venver's email of May 28, 2018.

62. On June 28, 2018, Venver called SAi again. In that telephone conversation, SAi asked Venver to stop calling about Gefco's proposal. SAi stated that Gefco had instructed SAi to not speak with Venver about Gefco's proposal.

**IX.     Gefco concealed material defects in the top drive carriage gear rack.**

63. In late 2019, Venver discovered that the gear rack of the top drive carriage is defective and needs to be replaced.

64. That gear rack is part of the rack and pinion gear system that drives the rig's top drive carriage up and down the derrick mast. The gear rack is a substantial and permanent feature of the derrick mast, being welded to the length of the 80-foot mast. The top drive carriage is powered along that rack by round gears ("pinions") with teeth that fit into the gear teeth of the rack.

65. In early May 2015, Venver asked Gefco to evaluate the state of the gear rack, because it appeared to be showing premature wear.

66. Gefco responded in a report that was dated May 12, 2015 and emailed to Venver on or about May 14, 2015. Gefco attributed authorship of the report to Dave Doering, its Director of Engineering. Gefco's report stated that the wear was "minor" and "not an issue with the rig."

67. In August 2015, however, a Gefco technician working on other repairs to Venver's VR-500 reported to Mr. Doering that:

> I looked at the gear rack today while the derrick was laid over. **The gear rack needs [to be] replaced because it was made from the wrong material or not hardened after machining**. In the [pictures] you can see a how the steel is rolled up. I thought it was just grease until I took a second look. You can also see the wear of the pinion tooth in the gear rack.
>
> This needs someone's attention asap to figure out what is wrong and how we are going to fix it.
>
> We need to keep in mind that they only drilled 1 1/2 wells and we are already seeing major wear. Rig 105 has nothing like this with 25,000 plus hours of drilling on it.

(emphasis supplied).

68. Gefco's technician, Mike Austin, apparently understood that Gefco wanted him to conceal such information from Venver, as he further reported:

> **I have not discussed this with anyone at VenVer yet. Hopefully no one seen me taking pictures.**

69. In reply, Gefco's Director of Engineering admitted that he had seen this same thing "back in may [sic] when the carriage bearing failed." Mr. Austin then further reported:

> I would say that the steel is pushed up about 1/4 to 3/8 above the top of the gear rack. Since we are showing wear on both sides [of the] rack I think the rack was not hardened after machining.

After inspecting the rack again the next day, Mr. Austin again reported: "**We definitely have a problem** because the steel is pushed out on top and bottom." (emphasis supplied).

70. Gefco never disclosed this to Venver. Gefco never corrected or otherwise modified its prior representation to Venver that the wear on the gear rack was "minor" and "not an issue." Venver first learned of Gefco's determination that the gear rack was defective and needed replacement when it found the above-quoted communications amongst the documents that Gefco produced in discovery in this case.

71. Gefco has not repaired or replaced the gear rack, and has never made any effort to repair or replace the gear rack.

72. Both prior to and after selling the VR-500 rig to Venver, Gefco represented that the static "hook load" of the VR-500 rig would be, and then was, 500,000 pounds. Gefco made this representation in the sales brochure that it provided to Venver, in the "rig book" delivered with the rig and dated July 2014, and on the rig's nameplate. The "hook load" of an oil and gas drilling rig is the sum of all the downward forces of the drill string as measured from the surface.

73. Gefco also represented, in pre-sale materials that it provided to Venver, that the VR-500's top drive was tough, durable ("es resistente, durable") and was the best in the industry ("es el mejor de la industria"). Gefco warranted that the VR-500 provides optimum bit load throughout the entire drilling operation ("durante toda la operación de perforación").

74. In the parties' sales contract of August 1, 2013, Gefco described the rig's hook load capabilities in terms of the speed at which the top head drive's rack and pinion gear system could move various loads. Gefco represented in the contract that the rack and pinion system could lift 454,000 pounds at 44 feet per minute.

75. Venver did not discover until the end of October 2019 that Gefco had determined that the gear rack was defective. Until then, there had been no reason for Venver to further investigate the wear on the rack after Gefco had assured Venver, in May 2015, that the wear was "minor" and "not an issue."

**X.    Gefco's conduct induced Venver to delay filing suit.**

76. Gefco repeatedly assured Venver that it would fix the deficiencies of the VR-500, and bring it into conformity with the contract. During that time Gefco repeatedly admitted that it owed such corrective action under the parties' contract. Meanwhile, Gefco affirmatively misled Venver regarding the condition of the top drive gear rack, and affirmatively acted to conceal its defective state, to assuage Venver's concerns and preclude further inquiry. Gefco's conduct and promises to Venver were such as were naturally calculated to and did induce Venver to believe that Gefco would take satisfactory corrective action if Venver did not sue, and Gefco's conduct and promises did induce Venver to not sue earlier.

## FIRST CAUSE OF ACTION—BREACH OF CONTRACT

77. Gefco contracted to sell a drilling rig and related equipment and services to ACT for the benefit of Venver. Gefco failed to deliver a drilling rig that conformed to the contract.

78. Venver and ACT have rejected the whole of the goods and services tendered by Gefco, as permitted by OKLA. STAT. ANN. tit. 12A § 2-601.

79. Alternatively, to the extent that either Venver or ACT is deemed to have previously accepted the rig sold by Gefco, Venver and ACT have revoked that acceptance, as permitted by OKLA. STAT. ANN. tit. 12A § 2-608. Any such acceptance would have been made without discovery of the rig's failure to conform to the contract and would have been reasonably induced by the difficulty of discovery. Alternatively, to the extent that either Venver or ACT is deemed to have accepted the rig with knowledge of its nonconformity, any such acceptance would have been made on the reasonable assumption that the nonconformity would be seasonably cured, and it has not been seasonably cured. The rig's failure to conform to the contract substantially impairs its value to Venver and ACT.

80. Venver and ACT have cancelled the contract, as permitted by OKLA. STAT. ANN. tit. 12A § 2-711, and have asked Gefco to return the purchase price.

81. Gefco's failure to deliver a conforming rig has caused Venver to suffer damages in addition to the purchase price.

82. Any contractual limitations on Venver's recovery are void because the limited-recovery provisions failed of their essential purpose of providing Venver with a working drilling rig that conformed to the contract.

**SECOND CAUSE OF ACTION—BREACH OF WARRANTY**

83. Gefco expressly warranted that the VR-500 rig would conform to the specifications of the parties' contract, and that the rig would be free from defects in

material and workmanship. Gefco expressly agreed to cure any such defects by replacement or repair.

84. The rig that Gefco delivered to Venver did not conform to the specifications of the parties' contract and was defective in design and construction. Gefco has failed to cure the defects of the rig, despite reasonable opportunity. Therefore, any limitations on the scope of Gefco's warranties, or on the remedies available to Venver and ACT, have failed of their essential purpose, and are void.

85. The rig also failed to comply with the implied warranty that it would be merchantable. The rig would not pass without objections in the trade under the contract description and was never fit for the ordinary purposes for which such a rig is used in the market in which Gefco knew the rig was intended to be used.

86. The rig also failed to comply with the implied warranty of fitness for a particular purpose. Gefco had reason to know at the time of contracting with ACT and Venver of the particular purpose for which the rig was required, and ACT and Venver relied on Gefco's skill and judgment to furnish a suitable rig. Yet Gefco failed to deliver a suitable rig.

87. To the extent that the parties' contract disclaims any implied warranties, the disclaimer is ineffective because it is tainted with and by Gefco's misrepresentations concerning the condition, quality, characteristics and fitness of the rig, as detailed further below. ACT and Venver relied on those misrepresentations to their detriment.

88. Gefco's failure to comply with its warranties has caused Venver to suffer damages.

## THIRD CAUSE OF ACTION—FRAUD, DECEIT

89. Gefco represented to Venver and ACT that it could and would make and deliver a drilling rig able to provide 11,500 ft-lbs of torque at 160 RPM (350 hp). Gefco made that representation in its price quote for the rig dated August 1, 2013. That quote became the parties' contract when Venver and ACT accepted it that same day. The contract was signed for Gefco by Aaron Harmon (Gefco's President at the time) and Art Kliewer (Gefco's Managing Director of Vertical Rig Sales). Gefco had also made that representation during the negotiations that led to the contract's execution. The Gefco employees and agents who made that representation, orally and in writing, included Art Kliewer, Dave Doering (Gefco's Engineering Manager), and Cristian Rodriguez Taulis (Gefco's International Territory Manager).

90. Gefco's representation that it could and would make and deliver a drilling rig able to provide 11,500 ft-lbs of torque at 160 RPM (350 hp) was untrue. When Gefco made the representation, it either knew it was false or made it recklessly without knowledge of its truth and as a positive assertion. Alternatively, Gefco made the representation as a positive assertion while having no reasonable ground for believing it to be true, OKLA. STAT. ANN. tit. 76 § 3, and/or in a manner not warranted by the information known to Gefco. OKLA. STAT. ANN. tit. 15 § 58.

91. Gefco made the representation with the intention that ACT and Venver act on it by agreeing to purchase the promised rig, and by paying for it. ACT and Venver did act on the representation by, among other things, agreeing to purchase the promised rig

and paying for it. Venver has suffered injury because of that reliance. 76 OKLA. STAT. ANN. tit. 76 § 2.

92. Gefco also represented to Venver that the VR-500 rig would be certified by the American Petroleum Institute ("API"). By way of example, Gefco made that representation on February 3, 2012, in an email from Gefco's agent Hector Piccin. Gefco again represented that the rig design would be evaluated by the API in an email dated January 23, 2013, from Cristian Rodriguez Taulis.

93. When Mr. Piccin represented that the rig would be certified by API, the "VR-500" rig design was built by a company called American Augers, Inc. At the time, American Augers was owned by Astec Industries. Gefco was also owned by Astec Industries (and remains so). When Astec Industries sold American Augers in 2012, it retained the design and rights to the VR-500, and placed these with Gefco.

94. To the extent Mr. Piccin's representation regarding anticipated API certification was true when made, it became untrue when Gefco took over the manufacture of VR-500 rigs and changed the manufacturing location for the rig sold to Venver. Gefco knew that Venver remained under the impression that the VR-500 rig would be API certified, but did not disclose that the VR-500 rig delivered to Venver would not be API certified. Gefco also knew that this fact was peculiarly within its knowledge and Venver was not in a position to discover the truth for itself. Accordingly, Gefco had a duty to disclose to Venver, before selling the VR-500 rig to Venver, that the rig would not be API certified.

95.     Gefco did not disclose that the VR-500 rig sold to Venver would not be API certified.  Gefco's representation that VR-500 rig would be API certified was material to Venver's decision to buy the rig.  Gefco concealed or failed to disclose that the rig would not be certified, with the intent of creating a false impression of the actual facts, with the intention that Venver act on that false impression.  Venver did act in reliance upon that false impression by, among other things, agreeing to purchase the promised rig and paying for it.  Venver has suffered injury because of that reliance.

## ATTORNEY'S FEES

96.     Plaintiffs ask for a reasonable attorney fee for the prosecution of this action.  Such a fee award is allowed by, for example, OKLA. STAT. ANN. tit. 12 §§936(A) and 939.

## CONDITIONS PRECEDENT

97.     All conditions precedent to these claims have occurred or have been performed.

## JURY DEMAND

98.     Plaintiffs requests trial by jury.

## PRAYER

99.     WHEREFORE, Plaintiffs Venver S.A. and Americas Coil Tubing LLC ask the Court to award them:

100.    The return of all monies paid to Gefco in connection with the purchase of the VR-500 rig and related equipment and services;

101.    Actual damages, including without limitation:

102. market price differentials and "cover" allowed by the UCC;

103. expenses incurred in the transportation, inspection, care and custody of the rig and related equipment and in the purchase of related equipment;

104. expenses incurred in attempting to cure the rigs' defects;

105. charges, expenses and commissions which may be incurred in effecting cover;

106. the cost of labor and other operating expenses incurred in attempting to operate the rig; and

107. lost profits, including the lost profits expected from Venver's contract with YPF;

108. exemplary damages;

109. pre- and post-judgment interest;

110. attorney's fees and expenses;

111. cost of court; and

112. such further relief, at law or in equity, to which Plaintiffs may be justly entitled.

Respectfully submitted,

_/s/ W. Casey Gray_
Bradley A. Gungoll OBA #3660
W. Casey Gray OBA #31379
Gungoll, Jackson, Box & Devoll, P.C.
101 Park Avenue, Suite 1400
Oklahoma City, OK 73102
(405) 272-4710 (Phone)

(405) 272-5141 (Facsimile)
gungoll@gungolljackson.com
gray@gungolljackson.com

**LOCAL COUNSEL FOR PLAINTIFFS**

**ATTORNEY-IN-CHARGE FOR PLAINTIFFS:**

  */s/ Reagan D. Pratt*
**Reagan D. Pratt**
Texas State Bar #00788218 (admitted to this Court)
Pratt & Flack LLP
4306 Yoakum Blvd., Suite 500
Houston, Texas 77006
Telephone:  713-936-2402
Facsimile:   713-481-0231
Email:  rpratt@prattflack.com

**OF COUNSEL FOR PLAINTIFF:**

**Paul D. Flack**
Texas State Bar #00786930
Pratt & Flack LLP
4306 Yoakum Blvd., Suite 500
Houston, Texas 77006
Telephone:  713-705-3087
Email:  pflack@prattflack.com